UNITED STATES, Appellee

v.

EUGENE HOLSEY, Private First Class, U. S. Army, Appellant

2 USCMA 554, 10 CMR 52

No. 1296*

Decided May 28, 1953

---

* Petition for rehearing by USCMA denied, 10 CMR 160.

LT COL James C. Hamilton, U. S. Army, for Appellant.

LT COL Thayer Chapman, U. S. Army, and 1ST LT Kenneth A. Howard, U. S. Army, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was tried by general court-martial upon a charge of unpremeditated murder, the specification thereunder alleging that he murdered Private Walter I. Gaskin by stabbing him with a knife. He was found guilty as charged and sentenced to a dishonorable discharge, forfeiture of all pay and allowances and confinement at hard labor for fifty years. The convening authority approved the findings and sentence. The board of review in the office of The Judge Advocate General of the Army, one member dissenting, affirmed but reduced the period of confinement to twenty years. We granted accused's petition for review limiting the scope thereof to a consideration of the sufficiency of the evidence and the instructions.

### I

The accused was a member of Headquarters and Headquarters Battery, Second Field Artillery Battalion, stationed at Fort Sill, Oklahoma. On the evening of October 26, 1951, he and the victim, together with several other enlisted men from their unit, were attending a battery party at the Douglas YMCA in Lawton, Oklahoma. The victim, Gaskin, was serving beer from a keg with a nozzle and tap on it. Originally men took cups up to the beer keg to have them filled and then returned to their tables. This necessitated making the trip to the keg frequently and to lessen the number of trips, they commenced to take bottles to the keg. The accused attempted to fill a bottle, but apparently due to back pressure, the experiment was not successful. Gaskin told him it would not work but accused continued in his efforts in spite of the fact that about all he accomplished was to spill beer on the floor. In the course of his endeavors accused succeeded in breaking the bottle. This angered him and he threw the remaining portion to the floor. An argument commenced between Gaskin and accused which might have resulted in a fight had the two not been held apart by other men. Corporal Freeman, who was in charge of the party, settled this argument by telling Gaskin to stay at his task and by escorting the accused to the west door of the hall and ordering him to remain there. About thirty minutes later, Corporal Freeman noticed them arguing again. Accused was being held but Gaskin was not. The Corporal again directed Gaskin to go on with his work and this time he took accused outside the hall to a vestibule and ordered him not to return. Each time the Corporal gave Gaskin directions they were complied with but not so with the accused. About five minutes thereafter, the accused returned and he and Gaskin were in a fight. While the record does not disclose which of the two struck the first blow it shows without dispute that the accused struck Gaskin in the chest with a knife and when Gaskin was turned away from the accused he was struck in the back. Another enlisted man in the group, in an attempt to stop the cutting, grabbed accused's hand and pushed him toward the door. Meanwhile, Gaskin walked about fifteen feet toward the bar and then fell to the floor where he expired from the multiple stab wounds in his chest.

### II

To properly assess the sufficiency of the evidence, consideration must be given to the elements of the particular type of murder involved. There may be ample evidence to support a finding on one theory of the case and yet insufficient to sustain another theory. In order to support a conviction of unpremeditated murder the evidence must show that the victim is dead from an act or omission of the accused, and facts and circumstances showing that the accused intended to kill or inflict great bodily harm, or was engaged in an act

inherently dangerous to others evincing a wanton disregard for human life as set out in Article 118 (2) and (3), respectively, Uniform Code of Military Justice, 50 U. S. C. § 712. The specification in the instant case merely alleges the accused killed the victim by means of stabbing him with a knife and therefore it is broad enough to cover either or both types of unpremeditated murder. Pretermitting for the moment the legal problems involved in deciding whether the finding in this case is properly sustainable under a theory of committing an act inherently dangerous to others, there is ample evidence to support a finding based on intent to kill or intent to inflict great bodily harm.

To sustain our conclusion concerning the evidence, we mention the facts which the court-martial could reasonably find to support its verdict. We omit any reference to the written exculpatory statement, which was executed by the accused and which was introduced in evidence by the Government, for two reasons. First, in considering evidence to support a finding, we can assume the court did not accept accused's version because it is inconsistent, improbable, contradictory and uncorroborated. Second, the accused testified for the limited purpose of opposing the introduction of the statement into evidence and he denied he made any such statement.

The death of the victim was established beyond peradventure of a doubt so the only question which concerns us is the sufficiency of the evidence to support the intent to kill or to do great bodily harm. The court-martial members could find either intent, beyond a reasonable doubt, from the following facts: The victim was working and carrying out his assigned duties for the evening; during the arguments he complied promptly with the orders given by the Corporal who was in charge of the battery party; the accused was the aggressor who precipitated the first two arguments; in the first instance he was led away from the dispute by the noncommissioned officer in charge and ordered to remain near the west door of the hall and not to annoy further the victim; in a very short time this order was disobeyed and the accused had soon brought on another dispute with the victim; in the first altercation both participants were being restrained by other personnel, but in the second argument, the victim must not have exhibited great belligerency as he was not held and he did not attempt to continue the encounter; the Corporal again restored order by directing the victim to go on with his work and by escorting the accused outside the hall; at that time the noncommissioned officer ordered the accused not to return inside the hall and not to interfere with the victim; a short time thereafter, the accused was back in the hall and this time the argument developed into the fatal fight; no one saw the first blow struck but a majority of the witnesses observed the accused stab the victim in the chest with a knife; apparently the force of the blow and the nature of the injuries caused the victim to turn and the accused then stabbed him in the back; one witness claims the accused was knocked down twice during the altercation but he does not fix these blows as being before or after he saw the knife being used by accused; after the victim fell to the floor mortally wounded, the accused wandered out into the hall and in a discussion with the Corporal denied he struck the accused with a knife.

From the foregoing facts and circumstances, the court-martial members could reasonably find the accused was the aggressor in the third encounter. On two occasions he was warned by a noncommissioned officer to cease bothering the victim and, on the third occasion, he violated orders by returning inside the building. He was looking for trouble and apparently was well equipped to inflict grievous bodily harm. He possessed a knife and used it in a manner which brought about the death of the deceased. The hospital records establish that death was caused by multiple wounds from a knife—a clear indication of repeated blows by the accused. The record is barren of any acts or conduct on the part of the victim which would justify or excuse the use of a weapon. If accused was excited it was brought on by his own misconduct and his behavior did not bespeak that

heat of passion necessary to reduce the killing to voluntary manslaughter. The sequence of events shows clearly that accused was so intent on precipitating a fight that he went so far as to return on three occasions to keep the arguments going. When his conduct finally succeeded in bringing about a physical encounter, he was adequately prepared by having a deadly weapon available for use. He used it in such a dangerous and fatal manner that death ensued. He was callously indifferent to the fatal consequences and when asked concerning the affray, he made no claim either as to self-defense or provocation. On the contrary, he merely denied having possessed or used a knife. When the facts are marshalled together we are satisfied the record supports a finding of guilt of the offense as alleged. However, for reasons which will appear more clearly hereinafter, they do not support the theory relied on by the Government.

## III

Appellate defense counsel has raised several assignments of error relating to the instructions given by ▌▌ the law officer. The most important of these is the assertion that the instruction setting out the elements of the offense with which the accused was charged is erroneous. This offense was unpremeditated murder proscribed by Article 118, Uniform Code of Military Justice, supra. Two sections of that Article deal with the offense of unpremeditated murder and as previously noted the specification alleged an offense under either or both. The sections of Article 118 involved are (2) and (3) which are as follows:

"Any person subject to this code who, without justification or excuse, unlawfully kills a human being, when he—

. . . . . . .

"(2) intends to kill or inflict great bodily harm; or

"(3) is engaged in an act which is inherently dangerous to others and evinces a wanton disregard of human life . . . ."

The instructions given by the law officer were as follows:

"The court is advised that the elements of this offense are as follows: One, that the victim named or described is dead; two, that his death resulted from the act or omission of the accused, as alleged; and Three, facts and circumstances showing that the accused was engaged in an act inherently dangerous to others, evincing a wanton disregard of human life. . . ."

It is the contention of the accused that the circumstances of the homicide in the instant case limit it to the provisions of section (2) of Article 118 and that by including the elements contained in section (3) the law officer committed prejudicial error for two reasons—(1) the latter section does not apply in those cases where the accused singles out one individual as a victim, and (2) there were no instructions given on the former section which was the only one involved in this factual background. That this was the issue which divided the board of review in its action upon this record is evidenced by the following language from the opinion of the dissenting member of that body:

"As stated by the majority of the board, both classes of unpremeditated murder under Article 118 are alleged in the same manner. (see MCM, 1951, App 6c, p 484), the specification being similar to a form of pleading sanctioned by the Supreme Court of the United States (see Form 1, Federal Rules of Criminal Procedure; see also Ochoa v. United States, 167 F2d 341, 345–346 (9th Cir 1948)). The specification can therefore be supported by evidence showing that the accused has committed murder as defined by either Article 118(2) or Article 118 (3), or both. It is my view, however, that the circumstances of the homicide here being considered clearly and decisively bring it within the scope of Article 118(2) to the exclusion of Article 118(3). The latter was the only section analyzed by the law officer in his instructions on the elements of the offense; thus no part of his instructions applied to the evi-

dence. The evidence shows that the accused did not mean to and did not endanger any one other than the deceased, although there were numerous bystanders, one of whom intervened and attempted to disarm the accused immediately after the stabbing. *The deceased himself, moreover, met his death not because he was by accident within the range of indiscriminate and reckless behavior on the part of the accused, but because the accused, after several arguments with the deceased culminating in fisticuffs, had singled him out as his intended victim.*" [Emphasis supplied]

In the recent case of United States v. Joe L. Davis (No. 646), 10 CMR 3, decided May 14, 1953, we reviewed the authorities from civilian jurisdictions where statutes substantially similar to Article 118(3) were in effect. Although the holdings are not unanimous, we concluded that the weight of authority lies with the construction that the inherently dangerous acts must be directed against more than one person and that the reasons relied on in those cases are consistent with the principles of the military judicial system. We there held that the language of Article 118(3) is applicable only in those cases where the actions of the accused endangered the lives of more than one and the victim received the fatal injury without the dangerous act being specifically directed at him. Our decision in the Davis case, supra, requires a reversal of the conviction in the present case. Here the dangerous acts of accused were directed solely against the victim. None of the other persons who witnessed the homicide were in danger at any time. After the accused had stabbed the victim, another soldier approached him and grabbed his right hand in an effort to obtain possession of the knife. He did not succeed because the accused switched the knife from his right to his left hand, but accused made no threatening motion toward the intervenor. The entire record portrays clearly an antagonism directed at one person only and under our interpretation of the law this leaves the evidence

insufficient to establish a necessary element of unpremeditated murder as defined by the law officer. Such being the case, the court-martial was authorized to find accused guilty of unpremeditated murder on a theory not supported by the evidence. But more than that the court was not given any instructions on the elements of the offense which was established by the record. Under such facts and circumstances, it is readily apparent that the accused was prejudiced. He is either guilty of unpremeditated murder because he intended to kill or to inflict great bodily harm or he is not guilty of that degree of the crime and the court-martial should have been so instructed. A court-martial cannot be permitted to find an accused guilty of an offense on a theory not reasonably raised by the evidence. Accordingly, the findings and sentence must be reversed.

## IV

In view of the fact that this case is being sent back for a retrial, we do not express any opinion on the other errors raised. The trial of this case was held on February 28, 1952, and since that time we have rendered opinions setting forth the rules and principles governing the necessity for, and the scope of, instructions on included offenses. Also we have announced principles governing the desirability of law officers instructing on affirmative defenses which are so closely interwoven with the details of the offense that a fair consideration of guilt or innocence requires some pronouncements by the law officer. Therefore, if there be other errors in the record, a question we do not now decide, they are not apt to be repeated on the retrial and any expression of opinion by us would not serve a useful purpose. On the contrary, it could influence a decision founded on evidence which might not be identical.

The decision of the board of review is reversed and a rehearing is directed.

Chief Judge QUINN and Judge BROSMAN concur.